**In re Yvonne ARCHIBALD, Debtor.**

**Yvonne Archibald, Plaintiff,**

**v.**

**United Student Aid Funds, Inc. and EFS Services, Inc., Defendants.**

**Bankruptcy No. 01–05477–FJO–7.
Adversary No. 01–242.**

United States Bankruptcy Court,
S.D. Indiana,
Indianapolis Division.

June 3, 2002.

David A. Mathies, Indianapolis, IN, for debtor.

Rex M. Joseph, Jr., Indianapolis, IN, trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANK J. OTTE, Bankruptcy Judge.

This matter came before the Court for trial on October 29, 2001. The parties attempted to resolve this matter post trial, however, the Court has been informed that such efforts have not been successful. This matter is now ready for the Court's consideration.

## INTRODUCTION

Plaintiff/Debtor Yvonne Archibald ("Archibald") filed her voluntary Chapter 7 Petition on April 17, 2001. On May 17, 2001, Archibald instituted this Adversary Proceeding to determine the dischargeability of student loan debts, pursuant to 11 U.S.C. § 523(a)(8). ECMC, the assignee of Archibald's student loan notes, filed an Answer in this case in response to the Debtor's claim that it would be an undue hardship on her and any of her dependants to repay the student loans at issue.

## *FINDINGS OF FACT*

1. Archibald is a single, 46 year old female with no dependents.

2. Between 1983 and 1997, Archibald accumulated student loan debt in excess of $96,000, much of which was incurred between 1993 and 1997.

3. Archibald repaid a total of approximately $500 of the student loan debt, all of which was paid in 1992.

4. Between 1980 and 1983 Archibald attended Indiana University Northwest at

Gary. After initially struggling, Archibald's grades began to improve somewhat. (Transcript, p. 73–74, Defendant's Exhibit 2). Nonetheless, she withdrew from her courses and attended Ivy Tech College in the hopes of pursuing a less demanding course of study.

5. After two years of pursuing a degree in Secretarial Studies at Ivy Tech, Archibald again returned to Indiana University Northwest at Gary. *Id.* at 13:10–24. From 1985 to 1990, Archibald pursued her Bachelor of Arts degree in Afro–American Studies, obtaining that degree in 1990. Her grades were markedly improved during this period, even qualifying for such honors as the Dean's List several semesters. *Id.* at 71:10–13, 75:11–17; *Also see* Defendant's Exhibit 2.

6. Prior to 1986, Archibald's education was funded entirely through student loans or grants. After 1986, Archibald's financial aid "ran out" and she obtained part-time employment to help pay for school. *Id.* at 75:2–6.

7. Archibald graduated with a 2.78 Grade Point Average despite her inauspicious start at Indiana University. (See Exhibit D–2). Based on her recent grades at the time, she was awarded the Senior Award in Afro–American Studies in 1990. *Id.* at 70:12–16.

8. Archibald applied for a state position after working several temporary jobs. In May of 1991, Archibald obtained a position with the Marion County Division of Families and Children. *Id.* at 19:9–25. After six months, she was terminated because she "wasn't a good worker." *Id.*

9. Archibald then enrolled in Marion College in 1992. There she studied to become a dietician. She attended one semester of classes, partially paid for by additional student loans. Her grade point average was 1.66. *Id.* at 20–21.

10. After withdrawing from Marion College, Archibald enrolled in Indiana University–Purdue University at Indianapolis ("IUPUI") to obtain her Masters in Social Work ("MSW"). *Id.* at 22; See Exhibit D–2.

11. Archibald's studies were uninterrupted at IUPUI except for a period in 1996, when she dropped out due to personal stress caused by family problems. *Id.* at 22:19–23. She testified that this stress resulted in depression, although no medical evidence was presented to substantiate this condition.

12. Archibald graduated from IUPUI in 1997, earning her Masters Degree in Social Work. Her final GPA was 3.09. (See Exhibit D–2).

13. After her last semester at graduate school in 1997, Archibald was awarded the Dan and Hannah McDonald Macro Scholarship. She was awarded at least $1,200.00. Archibald does not recall what she did with this scholarship money, but it was not used to pay off student loan debt. (Transcript, pp. 69–71).

14. After graduating from graduate school, Archibald testified that she worked several temporary jobs. She testified that she mailed between four and ten resumes to potential employers during this period. *Id.* at 103:17–20. She then obtained her current job at Personal Development Associates in April of 2000. *Id.* at 62:14–18.

15. Although she has produced no credible expert medical evidence of record, Archibald testified that at various times in her life she has suffered from depression. She introduced no evidence of an actual diagnosis.

16. Archibald stated that she is not currently in therapy, and is not depressed. *Id.* at 37:1–6. She did indicate that she would like to be in therapy and would like to be taking Zoloft, a prescription medi-

cation. *Id.* at 36:3–7. However, she further testified that she is able to work without both therapy and medication. *Id.* at 37:3–6.

17. Archibald resides with her boyfriend, Alfonzo Neal, and has lived with him during the last four years. *Id.* 69:15–17. She testified that her share of the expenses is mostly limited to the cable bill ($125 per month) and food and household expenses ($250 per month). *Id.* at 101:9–14. Other than those expenses, Archibald testified that Mr. Neal "pays for everything." *Id.* at 35:6–13.

18. Archibald testified that Mr. Neal has an income of approximately $90,000 per year working for Rolls Royce. *Id.* at 69:11–14.

19. Archibald testified that she "guesses" that she and Mr. Neal will eventually get married. *Id.* at 65:9–22.

20. Mr. Neal pays for Archibald's vehicle. *Id.* at 33:23–24.

21. Mr. Neal pays for the mortgage or rent payments. *Id.* at 35:18–23.

22. Archibald testified that while the Mr. Neal "makes a lot of money," the couple has "a lot of bills." *Id.* at 92:20–24. She also testified that her contribution to these bills varies.

23. Although Archibald produced what she alleges to be both "actual" and "hypothetical" monthly expense summaries, she produced no receipts or bills reflecting her actual monthly expenditures.

24. Evidence of six months of Archibald's actual expenses were introduced in the form of her checking account and savings account statements, as well as billing records for several credit cards. (See Exhibits D–5, D–6, and D–7). The total debits on her checking account statements ranged from $500.00 per month to almost $1,600.00 per month. The average of the six months appears to be closer to $750.00 per month. (See Exhibit D–7).

25. The charges shown on these accounts include multiple ATM transactions, charges to "Sunshine Café," "Burlington Coat Factory," "Bob Evans," "J.C. Penney," "Paula Young," and "Parisian." (See Exhibits D–5, D–6, and D–7). These expenses also include sizable checks cashed to herself, including checks for $192.00, $500.00, and $230.00, of which at least one appears to be intended for Mr. Neal from the notation line on its face. (See Exhibit D–7, check numbers 2447, 4014, and 4010).

26. Archibald testified that in one month she purchased items such as a wig for herself, a grill for Mr. Neal's stove, and items for her grandchild at Parisian. (Transcript at pp. 94–95). Other bank statements reveal similar expenses.

27. Prepetition and postpetition credit card bills introduced into evidence reveal that Archibald regularly makes substantial consumer purchases. She paid $276.68 at "Sears" for blinds in Mr. Neal's home. *Id.* at 81–82. She made a $104.97 at "Enzo" the same month. *Id.* at 82:3–11. Her bank and credit card statements also reveal that she spends a significant amount of her income on beauty supplies. *Id.* at 84:3–11; *Also see* Exhibit D–7.

28. When her credit card companies offered to increase her credit limits, Archibald requested multiple increases several times. *Id.* at 83–85. On her July Providian Card statement alone, the total charges associated with this totaled approximately $299.00. (See Exhibit D–5). Archibald testified that "Whenever they would give me one [a credit increase], I would take it." (Transcript, p. 85:2325). She also began using her Capital One credit card in March, 2001, soon after bankruptcy because she "knew I could pay the $15.00 [monthly minimum payment]." *Id.* at 87:13–15. By May or June of 2001 she

used the entire credit limit on that account by charging items she claims were for her granddaughter. *Id.* at 88:8–13.

29. Archibald testified that she spends significant amounts of money on her granddaughter. *Id.* at 90, 94, and 95. She testified that she does this out of moral obligation to help her 25 year old daughter. *Id.* at 112. Her daughter, however, earns more of an income than Archibald purports to make, with a regular salary of $12.90 per hour. *Id.* at 65.

30. Archibald also pays for, or at least contributes to, her daughter's daycare expenses for her granddaughter. *Id.* at 64:24–25.

31. Archibald has shown no evidence of regular or unusual medical expenses.

32. Archibald testified that she is working at Personal Development Associates where she currently earns about $1,300 per month, net after taxes. *Id.* at 30–31.

33. The work appears to be part-time and with flexible hours. *Id.* at 63:3–9. Archibald did indicate she spends about 5 hours per day in the office. She alluded to some work she does at home, but did not elaborate. *Id.*

34. Archibald testified that a one point, she stayed home to take care of her granddaughter while her daughter was at work. Now that the child is in daycare she does so only "sometimes." *Id.* at 64:10–23.

35. Archibald testified that she is attempting to gain experience in her field so that she may become licensed and obtain better employment. *Id.* at 32–33.

36. Archibald stated that she has been turned down by employers in the past due to her lack of experience. *Id.* at 33:3–5.

37. Archibald testified that she is qualified to earn at least $28,000 to $29,000 per year in her profession. *Id.* at p. 53:8–15.

Even without experience, a position in her field starts at $27,000 per year. *Id.* Were she hired, her income would "go up from there." *Id.* at 101:19–22.

38. Archibald introduced documentary evidence that the median annual salary in her field in 1998 was $30,590. See Plaintiff's Exhibit E. This evidence, from the U.S. Department of Labor, Bureau of Statistics, also indicates that the "Employment of social workers is expected to increase *much faster than the average* for all occupations through 2008." *Id.* at p. 5 (emphasis in original).

39. Archibald could consolidate her loans under the Income Contingent Repayment Plan administered under the William D. Ford Direct Loan Program (the "Ford Program") and repay them at a rate of not more than 20% of her aggregate gross income over the federal poverty level over a period of 25 years. After such 25 year period, to the extent to which she did not repay her loans, Archibald would receive a cancellation of the remainder of the balance of the loan. Under present law, it appears that such a discharge (at the end of the 25 years) could be subject to cancellation of indebtedness income for federal income tax purposes.

40. Under the Ford Program's Income Contingent Repayment Plan, and assuming a debt of $98,000 at an interest rate of 8.25% and an income of $13,000 per year, Archibald's estimated monthly payment would be approximately $73.50, which she could clearly afford to make.

41. ECMC is a non-profit corporation that defends student loans in bankruptcy cases for the federal government and other guaranty agencies. Of every dollar collected on Archibald's student loans, 76 cents goes into a reserve fund (owned by the Department of Education) and 24 cents is deposited into ECMC's operating

account. If the Court discharges the Debtor's obligations to ECMC, the Department of Education will not receive the funds that would have been otherwise deposited into the reserve fund.

### CONCLUSIONS OF LAW

1. Pursuant to 11 U.S.C. § 523(a)(8), the Court may discharge an otherwise nondischargeable student loan if excepting the debt from discharge will impose an undue hardship on the debtor or the debtor's dependents.

■ 2. Archibald had the burden of proving that she qualifies for a "hardship discharge." *In re Roberson*, 999 F.2d 1132, 1137 (7th Cir.1993), *citing In re Webb*, 132 B.R. 199, 201 (Bankr.M.D.Fla. 1991); *In re Ealy*, 78 B.R. 897, 898 (Bankr.C.D.Ill.1987). Archibald failed to carry this burden of proof.

■ 3. In the Seventh Circuit, to prove undue hardship, a debtor must demonstrate that:

(a) she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(b) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(c) the debtor has made a good faith effort to repay the loans. *Roberson*, 999 F.2d at 1135.

### Analysis under part one of the Brunner/Roberson test

■ 4. Archibald failed to prove that she cannot maintain a "minimal" standard of living for herself. She failed to show that she has maximized her income. Her own testimony suggested that she was capable of earning over twice as much as she currently earns. The documentary evidence that she submitted to the Court as evidence suggested that her salary could be significantly greater, despite the fact that the figures used are not inflation adjuster from 1998.

5. Archibald failed to demonstrate that she took adequate steps to obtain the best paying employment. While she did produce evidence of an effort to find employment, her effort fell far short of that necessary to meet her burden under the *Brunner/Roberson* test. As indicated in the facts section, Archibald testified that after graduating she sent between 4 and 10 resumes to potential employers. The Court notes that she did describe some less formal "word of mouth" efforts to obtain employment. Given her qualifications, if Archibald could truly not maintain a minimum standard of living, surely a more determined effort should be made to maximize her earning potential. The evidence produced was not sufficient to suggest that Archibald has diligently tried to maximize her employment or her income. With her education and intelligence, at a minimum, Archibald could make a greater income merely by obtaining employment outside of her field. Rather, the evidence suggests a lack of motivation to find full time employment most likely due to the fact that most of her basic expenses are paid for by her "significant other," Mr. Neal.

6. Archibald failed to adequately document or testify to her expenses in a manner sufficient for this Court to grant an undue hardship discharge. Many of the expenses she incurs, while not extravagant, do not suggest that she is currently minimizing her expenses. By her own testimony, Mr. Neal pays for "everything," requiring her to pay only for certain food and household goods ($250 per month) and the cable bill ($150 per month). The Court

notes while that she is not required to pay for anything on Mr. Neal's behalf, even if Mr. Neal does pay for her other necessities, her expenses suggest that she is spending a significant amount of her income on discretionary items. Furthermore, Archibald spends a significant amount of her monthly income on her granddaughter, either in the form of clothes, toys, or daycare costs. This is discretionary on her part.

### Analysis under part two of the Brunner/Roberson test

7. Archibald has failed to show that her situation presents a "certainty of hopelessness." Indeed, she could consolidate her loans over a period of 25 years under an extended repayment program or the Ford Program's Income Contingent Repayment Plan.

8. Archibald testified that she is gaining experience from her present employment and hopes to use that experience to obtain a further license in her field. This alone suggests that Archibald is contemplating advancement with a commensurate increase in salary. She indicated that in the first few years after she graduated, her lack of experience posed an obstacle to better employment. She is currently obtaining the needed experience.

9. Having graduated only a few short years ago, Archibald failed to show that any legitimate problems she may have had in obtaining employment initially will persist in the future. Should she find more lucrative employment during the repayment period, a discharge of her student loan obligations now would be a disservice to the U.S. taxpayer.

### Analysis under Part three of the Brunner/Roberson test

10. Archibald has not met her burden to prove that she made a good faith·effort to repay her loans. Although she testifies that she did at least make a few payments on her federally guaranteed student loan debt, the evidence indicates that she also took on a number of self-imposed hardships during other portions of the repayment period, instead of choosing to repay some amount toward her loans.

11. The evidence indicates that after graduating, Archibald chose to take care of her granddaughter in favor of obtaining employment. She also admittedly spent substantial sums on her granddaughter for clothes and other items rather than repay her student loan obligations. She has no legal obligation to make these expenditures and they constitute self-imposed hardships that weigh against discharge. *In re Conner*, 89 B.R. 744, 749 (Bankr. N.D.Ill.1988) (Debtor's financial aid to majority age daughters was "legally voluntary" and "must be regarded as self-imposed.").

12. Archibald failed to show that many of her other expenses were necessary and did not constitute self-imposed hardships. The evidence suggested that many of these expenses were self-imposed and not necessary to maintain a minimal standard of living.

13. Archibald's household situation also suggests a lack of good faith effort to repay her student loan obligations. Archibald testified that she has lived with Mr. Neal for the past four to five years. The couple's combined income is over $100,000 per year. Yet, during this time Archibald has made no effort, however small, to repay her student loan obligations. It is also not inconceivable that Mr. Neil's subsidization of Archibald's expenses has had a negative impact on her motivation to find regular employment.

14. It would undermine the *Roberson* decision for the Court to ignore the

fact that, by living with Mr. Neal, Archibald has been living a standard far above what is considered "minimum" for most Americans. Even if Mr. Neal has no obligation to repay her student loans, the facts indicate that Mr. Neal subsidizes s substantial portion of Archibald's lifestyle. The Court recognizes that Mr. Neal has no obligation to repay Archibald's student loans, but also realizes that to ignore this fact would create an anomaly in the law that would unfairly burden the U.S. taxpayers, many of whom are struggling to pay off similar student loans on household incomes that amount to less than a fifth of Archibald's effective household income. Mr. Neal's income, by the Plaintiff's own admission, has a substantial effect on Archibald's actual or necessary expenses, and are therefore relevant to a determination of whether she can maintain a minimal standard of living. The Court will not deal with hypotheticals.

15. The fact that the amount of Archibald's outstanding student loan obligations is daunting by any standard is not lost on this Court, either. However, one reason they are so daunting is because Archibald failed to pay even the interest on these loans when she had the opportunity, whether it be from funds saved and pinched, or from scholarship award money granted to her. Furthermore, the Court notes that the majority of these loans were used to obtain Archibald's recent graduate degree, suggesting that Archibald was fully aware of the amounts she would have to repay upon graduating. Regardless, the amount of the loans in question do not alter Archibald's burden of proof in this case.

16. Finally, the Court notes that Archibald failed to avail herself of the various repayment programs available. These programs offer reduced payments over an extended period of time, with a forgiveness of the remaining debt at the expiration of the payment period.

■ 17. The tax implications of a discharge under the ICRP are speculative at best given that the ICRP is approximately eight years old. However, it does appear that under current tax law it is not unlikely that a discharge at the end of such a program could be considered cancellation of indebtedness income to the debtor. Despite this, the availability of the ICRP is still a factor to be considered in the *Brunner/Roberson* analysis. Several courts have addressed this, finding that any possible income tax liability in the future is too speculative to rule out the feasibility of the ICRP. *Dept. of Education v. Rose (In re Rose)*, 227 B.R. 518, 525–526 (W.D.Mo. 1998) (Stating that "the 25–year option should be considered" and that the potential for a large income tax burden can be ameliorated given the IRS's "authority to forgive tax debt through offers of compromise if there is doubt as to collectability" under 26 C.F.R. § 301.7122–1.) Moreover, Archibald overstates the possible tax implications—she would clearly not have to pay a tax equal to the entire amount cancelled—at most, it would be the amount cancelled multiplied by her applicable tax rate.

18. The charge of this Court under § 523(a)(8) is to determine the issue of undue hardship as of today, not some date in the future. The Court does not conclude that the ICRP is the determinative factor in making a determination in this case, but given the speculative nature of the possible future income tax liability of the Debtor, it is a legitimate factor for a court to consider. In the twenty-five years that Archibald has to repay under any extended plan, she will likely obtain employment more in line with her educational qualifications, making the income tax treatment of a fully or near fully paid off loan negligi-

ble. In addition, in the event of her death or disability, the income tax treatment of a discharge in 25 years would be moot. There are simply too many unknown possibilities for the Court to disregard the fact that Archibald presently has options within her means to repay her student loan obligations.

19. Finally, focusing on the tax liability of the ICRP also ignores the fact that when Archibald's salary climbs into the range she feels it could ($30,000 per year), she can minimize or eliminate any future tax liability on discharge by repaying more than the monthly amounts proscribed by the ICRP for the rest of the life of the loan. This is particularly evident when one considers that Mr. Neal pays for many of Archibald's expenses.

Request for Partial Discharge

20. The Court denies the Debtor's request for partial discharge. For all of the reasons cited above, the Court finds that this Debtor has not put on sufficient evidence under *Roberson* for the Court to even consider the availability of a partial discharge. At a minimum, the Debtor would have had to establish all the elements of "undue hardship" for the Court to consider such relief. To allow a debtor to discharge a student loan debt without a showing of hardship would thwart Congress' attempt to make it more difficult to abdicate such an obligation. *Tennessee Student Assistance Corp. v. Mort*, 272 B.R. 181, 184–85 (W.D.Va.2002). Only then could an inquiry into the equities of a debtor's situation be addressed. Archibald has shown no reason as to why she should be allowed to avail herself of the equitable powers of the Court. On the contrary, while she testified that certain portions of her life have been difficult, she has made no effort to repay her most recent student loans at a point in time when she is arguably at the most stable and promising stage of her life. Over the last half-decade, she has lived in a household whose income lies easily in the top 10% (perhaps even 5%) of all households. Her only expenses are food and cable television. She is not disabled. She is no longer in therapy and is able to function normally without it. She even has the luxury of forgoing employment to care for her granddaughter or to alternatively contribute to that granddaughter's daycare expenses without fear of losing her home or being unable to afford something to eat. Yet during this time, no effort has been made to repay her student loan obligations. The Court finds it difficult to grasp why the concept of equity, which encompasses a good faith inquiry, demands a discharge of Archibald's normally nondischargeable debt. *Id.*

21. The Court also rejects Archibald's argument that the amount of debt in this case demands at least an equitable partial discharge. Archibald asserts that she is entitled to a "fresh start." This contrary to the concept of exceptions to dischargeability. The Court sympathizes with Archibald, but is not convinced that her predicament is beyond her reasonable control. Archibald spent 17 of the last 22 years in school, most of that time without employment as a full-time student. During this time she carried with her the spectre of student loan debt. With the exception of several months in 1992, not once did this cause her enough anxiety to curtail her expenses and begin to repay any amount toward these loans. The Court recognizes that Archibald might not ever repay her entire student loan obligation, perhaps never even pay any part of it. One thing is clear, however. Absent a showing of undue hardship, she is not entitled to walk away from any of these obligations.

*Conclusion*

Based upon the foregoing, this Court holds that Archibald failed to demonstrate

undue hardship, as outlined in the *Brunner* test. The Court will, by separate entry, enter judgment in favor of ECMC and against Archibald on her Complaint. Archibald's debt to ECMC is declared nondischargeable.