In re Craig A. LORENZ, Debtor.

Craig A. Lorenz, Plaintiff/Appellee,

v.

American Education Services/Pennsylvania Higher Education Assistance Agency, Defendant/Appellant.

BAP No. MW 05–031.
Bankruptcy No. 03–47259–JBR.
Adversary No. 04–4305.

United States Bankruptcy Appellate Panel for the First Circuit.

Feb. 1, 2006.

Neil D. Warrenbrand, on brief for Defendant/Appellant.

Robert F. Casey, on brief for Plaintiff/Appellee.

Before LAMOUTTE, HAINES and DEASY, United States Bankruptcy Appellate Panel Judges.

HAINES, Bankruptcy Judge.

American Education Services/Pennsylvania Higher Education Assistance Agency ("AES/PHEAA")[1] appeals from the bank-

---

1. PHEAA is a governmental agency providing financial assistance to students enrolled in higher education programs throughout the country. AES is a division of PHEAA.

ruptcy court's judgment deeming the debtor's student loan obligations to AES/PHEAA dischargeable pursuant to 11 U.S.C. § 523(a)(8). We conclude that, given the debtor's income, his expenses, and the conceded economic relationship of the debtor and his life partner, he did not carry his burden of demonstrating that excepting his educational loan from discharge would result in undue hardship. Accordingly, we REVERSE.

## BACKGROUND

### 1. Procedure.

Craig Lorenz voluntarily filed for Chapter 7 relief on December 22, 2003. Thereafter, he initiated an adversary proceeding against AES/PHEAA seeking to discharge approximately $139,000 in student loan debt pursuant to § 523(a)(8).[2] Lorenz's student loan obligations consisted of two loans: a guaranteed student loan ("guaranteed loan") and a Health Education Assistance Loan ("HEAL loan") with approximate balances of $72,000 and $82,000, respectively.

█ In short order the United States of America was substituted as defendant with respect to the HEAL loan. It immediately moved to dismiss the action insofar as the HEAL loan's discharge was concerned. Relying on 42 U.S.C. § 292f(g), the bankruptcy court granted the government's motion.[3] Lorenz does not challenge that determination.

Subsequently, after first trying AES/PHEAA's § 727(d) complaint (seeking revocation of Lorenz's discharge), the bankruptcy court tried the § 523(a)(8) action.[4]

### 2. Facts Established at Trial.

Lorenz is a 39–year old man with a B.S. from Fordham University (1988), and a Doctor of Podiatric Medicine degree from Pennsylvania College of Podiatric Medicine (1992). He embarked on a career in podiatry anticipating earning in the neighborhood of $100,000 a year, and incurred all his student loan debt in the process.

Upon graduation, Lorenz completed successive residencies with the U.S. Department of Veterans Affairs in Philadelphia and at a Bucks County, Pennsylvania, hospital. During the residencies, his annual compensation did not exceed $15,500. Thereafter, Lorenz associated with a general podiatric practice in Medford, New Jersey, at an annual salary of $34,000, without benefits, working approximately 60–70 hours per week. Unable to resolve a salary dispute, Lorenz left after about a year.

After searching unsuccessfully for employment as a podiatrist in the Philadelphia area, in January 1996 Lorenz moved to Massachusetts to accept a position with HealthDrive Corp. of Newton, Massachusetts. There he provided general podiatric services to nursing home patients in Massachusetts and New Hampshire at a start-

2. All references to the "Bankruptcy Code" and all references to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. § 101, *et seq.*

3. HEAL loans can be discharged only rarely—where excepting them from discharge would be "unconscionable." *See generally* William A. Norton, Jr., 3 *Norton Bankruptcy Law & Practice 2d* § 47:53 at 47–164 (1997 & Supp. 2005) (hereafter *"Norton"*).

4. The court conducted two trials on the same day. It first heard evidence anent the § 727(d) claim. After concluding discharge revocation was not in order, the student loan cause was heard. With the parties' consent, the testimony and exhibits from the first trial were incorporated in the record of the second.

ing annual salary of $52,000, plus bonuses and benefits including paid vacation and sick days, health insurance, and a 401(k) retirement plan. While working at HealthDrive, Lorenz made regular payments on both the guaranteed loan and the HEAL loan. In June 1999, dissatisfied with "Medicaid cutbacks," "compensation changes," and other problems (*e.g.*, lack of clerical and nursing support), he left HealthDrive, effectively ending his podiatry career.

After leaving HealthDrive, Lorenz was unemployed for about six months, then worked at odd, entry-level jobs for a short time. In January 2002, he went to work at UnumProvident Corp. as a disability-claim representative, with a starting salary of $35,000. Although he was making about $41,000 a year by December 2003, he quit his position because he found the work "unfulfilling." Immediately thereafter Lorenz enrolled in nursing school at the University of Massachusetts, Amherst. Although he did not work throughout the course of his nursing education, by the time of trial his graduation was imminent. He anticipated immediate employment as a registered nurse at a starting salary of approximately $46,000 per year, with the possibility of overtime and future raises.

Lorenz lives in West Brookfield, Massachusetts, in a house he purchased in 2001 with his domestic partner, Richard Rene. He and Rene have lived together since 1996. They each testified that, since approximately 1998, they have conducted their affairs as a single financial unit. They maintain joint bank accounts and pay all their bills from shared accounts. Rene characterized their relationship as "much like that of a married couple."

The pair purchased their first house together in Amesbury, Massachusetts in 1998. In 2001 they realized $58,000 from its sale. Although Lorenz was then unemployed, or at least under-employed, and making no payments toward the guaranteed loan (he had an economic hardship forbearance throughout 2001), the full $58,000 was devoted to purchasing the West Brookfield property. Lorenz and Rene conceded that they have refinanced debt and obtained equity loans on the West Brookfield property several times, and have received cash in the course. They used the cash to make improvements to their home, to pay off a car loan, and to fund Lorenz's nursing education.[5] In no case were those funds used to reduce Lorenz's student loan balances.

Lorenz's monthly expenses total $2,275.00, including $850 for rent/home mortgage payment.[6] Although he is not personally liable on the mortgage note secured by the West Brookfield property,[7] Lorenz puts money "into the pot that was paying the mortgage" because he "has to pay to live somewhere." In addition, of

---

**5.** Lorenz's schedules list the West Brookfield property as having a value of $316,667, with secured debt of $258,625. At trial, Rene testified that the secured debt was actually higher, closer to $280,000. Rene has also withdrawn funds from his 401(k) plan to help pay nursing school bills.

**6.** Lorenz's monthly expenses also included $150 for utilities, $50 for telephone, $53 for cable, $15 for water filtration, $33 for gifts, $40 for home maintenance, $350 for food, $50 for clothing, $15 for laundry and dry cleaning, $120 for out of pocket medical ex-

penses, $200 for transportation, $100 for recreation, $36 for life insurance, $70 for auto insurance, $6 for excise taxes, $25 for vacation, $12 for garbage disposal and $100 for meals outside the home.

**7.** It appears Lorenz and Rene transferred record ownership of the West Brookfield property shortly before bankruptcy, ostensibly to facilitate refinancing or a home equity loan At bankruptcy, the two owned the property jointly. These facts play no role in our decision.

course, Lorenz remains obligated to pay his undischarged HEAL loan of $82,000.

Lorenz is in good health and has no dependents. Over the years, he has paid approximately $45,000 toward his student loans.[8] In the past, Lorenz consolidated his loans to reduce monthly payments, and repeatedly contacted the loans' servicers to discuss repayment arrangements.

### 3. The Decision Below.

The case was tried and argued under the "totality of the circumstances" test for gauging student loan dischargeability. *See, e.g., Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque)*, 303 B.R. 548 (Bankr.D.Mass.2003); *Kopf v. U.S. Dep't of Educ. (In re Kopf)*, 245 B.R. 731 (Bankr. D.Me.2000). In concluding that Lorenz's guaranteed loans would be discharged, the bankruptcy court reasoned as follows:

> Looking at the Debtor's income prospects, the Court assumes that the Debtor will be gainfully employed shortly as a registered nurse. The Debtor testified that he expects his starting salary to be about $46,000 per year, which the Court determines would yield approximately $2,874.75 of available funds on a monthly basis....
>
> The only other evidence relating to Debtor's probable income were the wage statistics proffered by the Defendant .... Although no witness testified to these statistics, and no substantive information was provided, the Court assumes that the "Worcester, MA–CT PMSA" chart represents the most likely region in which Debtor will be working. Accepting the mean annual salary for this analysis, Debtor's anticipated income would be ... $55,140.00 [which the court

determined would yield] ... $3,446.25 monthly.

> ...
>
> [T]he Debtor's expenses are approximately $2,200. The $2,200 includes rent or mortgage payment—the Defendant challenged this number, but "shelter" is a necessary expense and the Court finds $850 is a reasonable shelter cost. Some of the Debtor's figures seemed slightly high to the Court but were not challenged by the Defendant. Considering all of the expenses on Schedule J, the Court concludes that $2,200 is a reasonable starting point. There was testimony that the Debtor's vehicle is now burdened with high mileage, thus the Court recognizes an expense for vehicle repair and/or replacement of at least $150.00 per month. Without leading an unreasonable or extravagant lifestyle, the Court finds the Debtor's expenses are approximately $2,350/month before student loan payments.
>
> The HEAL Loan Payment at 8% per year would yield a monthly payment of approximately $600.00 per month for 360 months (30 years). Thus, before the [guaranteed] loans are considered, the Debtor's monthly expenses are:
>
> Expenses ($2,350) + HEAL Loans ($600.00) = $2,950.00
>
> The Newmeyer affidavit submitted by the Defendant ... is the only evidence in the record concerning the amount necessary to amortize the loans under consideration here. Although there is no explanation of the "graduated payment options," it appears that all options call for a 360 month (30) year amortization at between $490 and $546 per

---

8. In an affidavit submitted by AES/PHEAA and entered into evidence without objection, Krista Neumyer, an Administrative Officer for the Legal Services Division of AES, stated that Lorenz made total payments on the guaranteed loan in the amount of $7,964.56. He made full monthly payments from December 1997 through June 1999.

month. Using $525 as a rough midpoint, the Debtor's expenses would be: Expenses $2,350 + HEAL Loans $600 + subject student loans $525 = $3,475.00

. . .

Based on the Court's analysis of the future affairs and prospects of the Debtor, whether using the "totality of the circumstances" [test] embraced in the past or reconsidering and adopting the *Brunner* test, the Court comes to the same conclusion: it would be an undue hardship for the Debtor to satisfy his student loan obligation, regardless of which income figures are used, as using either set of figures, the Debtor's expenses will exceed his income. Further, the Debtor's lifestyle appears to the Court to be modest. Comparing his expenses to his income, it is clear the Debtor lacks sufficient funds at the end of each month to meet his student loan obligations without suffering an undue hardship.[9]

AES/PHEAA timely filed a notice of appeal.

### JURISDICTION

■ A bankruptcy appellate panel may hear appeals from "final judgments, orders and decrees [pursuant to 28 U.S.C. § 158(a)(1)] or with leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3)]." *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* at 646 (citations omitted). An interlocutory order "'only decides some intervening matter

pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.'" *Id.* (quoting *In re American Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)). A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits even if not raised by the litigants. *See In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724 (1st Cir. BAP 1998).

■ A bankruptcy court's dischargeability determination for student loan obligations is a final order. *See Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly)*, 312 B.R. 200, 204 (1st Cir. BAP 2004).

### STANDARD OF REVIEW

■ Appellate courts generally apply the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law. *See TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir.1995); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 719–20, n. 8 (1st Cir.1994). The undue hardship determination is a question of law, reviewed *de novo*; the bankruptcy court's underlying factual findings are reviewed for clear error. *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393 (4th Cir.2005) (citing cases); *see Kelly*, 312 B.R. at 204 (adopting approach of other circuits in absence of First Circuit precedent); *Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 837 (1st Cir. BAP 2004) (same).

There no dispute about the facts. The thrust of AES/PHEAA's appeal is that the bankruptcy court's undue hardship determination was legal error.

9. Memorandum of decision dated June 17, 2005, Appellant's App. at 23–26 (footnotes omitted).

## DISCUSSION

### 1. Burden of Proof.

 Under § 523(a)(8), educational loans will not be discharged unless excepting the loans from discharge will impose an undue hardship on the debtor and the debtor's dependants. *See* 11 U.S.C. § 523(a)(8).[10] The creditor bears the initial burden of demonstrating that the debt exists and that the debt is of the type excepted from discharge under § 523(a)(8). *See Savage*, 311 B.R. at 838–39.[11] Once the threshold showing has been made, the burden shifts to the debtor to prove by a preponderance of the evidence that excepting the student loan from discharge will cause the debtor and his dependents "undue hardship." *Id.; see generally* William L. Norton, Jr., 3 *Norton* § 47:52 at 47–156 (1997 & Supp.2005) (noting that, with proof of a debt coming within § 523(a)(8)'s purview, the debtor's undue hardship showing is in the nature of an affirmative defense). There is no dispute that the guaranteed loan is an educational loan or that § 523(a)(8) applies. We are concerned only whether the bankruptcy court correctly concluded Lorenz proved undue hardship.

### 2. Determining "Undue Hardship".

 The bankruptcy court applied the "totality of the circumstances" test. AES/PHEAA argues on appeal that the bankruptcy court should have employed the so-called *Brunner* test. *See Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir.1987). However, AES/PHEAA did not advance this argument at trial, where it addressed the "totality of the circumstances," relying heavily on *In re Bourque*, 303 B.R. 548. Ordinarily, AES/PHEAA's failure to raise the point below would constitute waiver and we would not address it. *See Savage*, 311 B.R. at 840 (citing *Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265 (1st Cir.1999) (appellate court will not address issues raised for the first time on appeal)). Here, however, the question is not straightforward. The bankruptcy court ruled in the alternative, concluding that excepting the guaranteed loan from discharge would work an undue hardship under either test. We need not detour to confront the point, as we conclude that Lorenz's showing was fundamentally, and fatally deficient, under either model.

 The "totality of the circumstances" analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other pre-petition debts. *Kopf*, 245 B.R. at 739; *see also Hicks v.*

---

10. Section 523(a)(8) states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11. This allocation is accurate, but is essentially *pro forma*. The debtor is generally the plaintiff and the complaint will invariably concede the existence and character of the debt.

*Educ. Credit Mgmt. Corp. (In re Hicks),* 331 B.R. 18, 31 (Bankr.D.Mass.2005) (distilling so-called totality of the circumstances test to "one simple question: *Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?"*). Courts "should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses." *Hicks,* 331 B.R. at 31; *see also Kelly,* 312 B.R. at 206; *Savage,* 311 B.R. at 840; *Bloch v. Windham Prof'ls (In re Bloch),* 257 B.R. 374, 378 (Bankr.D.Mass. 2001); *Kopf,* 245 B.R. at 744.

■ The *Brunner* test differs, albeit modestly. *See Kopf,* 245 B.R. at 731 (comparing tests). *Brunner* requires a "three-part showing (1) that the debtor cannot, based on current income and expenses, maintain a 'minimal' standard of living for herself or her dependants if forced to repay the loans; (2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans." *Brunner,* 831 F.2d at 396. At least one district in this circuit has adopted the *Brunner* test for use in determining student loan dischargeability actions. *See Grigas v. Sallie Mae Servicing Corp. (In re Grigas),* 252 B.R. 866, 874 n. 8 (Bankr. D.N.H.2000) (following Judge Vaughn's decision in *Garrett v. N.H. Higher Educ. Assistance Found.,* 180 B.R. 358 (Bankr. D.N.H.1995), but expressing the view that the tests are "similar").

One can see readily that insofar as income and expenses are concerned, the tests take converging tacks. The "totality test" looks to past, present, and future "financial resources" and "necessary living expenses" and whether, taken together with other factors, the debtor has the ability to repay while maintaining a minimal standard of living. *Brunner* asks the same question looking to "current" income and expenses, then considers whether circumstances inhibiting repayment will endure. However one frames the financial inquiry, Lorenz's showing was inadequate to prevail on the point.

**3. Hardship and the Household.**

■ AES/PHEAA's primary argument is that the bankruptcy court erred by considering only the debtor's income and expenses, as opposed to his household's, in making its § 523(a)(8) determination. Before addressing the argument, we pause to consider whether AES/PHEAA has preserved it. At trial it pressed the point only modestly.[12] In closing argument its counsel mentioned, almost in passing that the "two gentlemen ... just like their current standard of living" and that "[i]t's a nicer standard of living than most people enjoy."[13] Thus, AES/PHEAA's approach was, at best, meek and oblique. Nevertheless, as explained below, the deficiency rests not in AES/PHEAA's defense of Lorenz's claim, but inheres in the substance of the claim itself. We think that AES/PHEAA's minimalist approach was

---

**12.** Although AES/PHEAA's attorney cross-examined Rene, the questioning focused principally on real estate ownership and refinancing. He asked no questions at all about Rene's income and expenses. App. at 197–201.

**13.** App. at 96.

marginally sufficient to apprise the court and Lorenz of its position.[14]

■ Given that both Lorenz and Rene (who was called as Lorenz's witness) forthrightly conceded that they are, and for years have operated as, a single household, a single financial entity, it was incumbent on Lorenz to prove undue hardship *within that context.* The couple's historical and ongoing practices, including devotion of joint assets, and Rene's personal assets, to Lorenz's personal expenses, education, and well being, compel our conclusion.

■ Section 523(a)(8) requires bankruptcy courts to consider the income of a non-debtor spouse when deciding whether excepting a debtor's student loans from discharge will impose an "undue hardship" on the debtor. *See, e.g., Dolan v. American Student Assistance (In re Dolan),* 256 B.R. 230, 236 (Bankr.D.Mass. 2000); *Greco v. Sallie Mae Serv. Corp. (In re Greco),* 251 B.R. 670, 676–77 (Bankr. E.D.Pa.2000); *White v. U.S. Dep't of Educ. (In re White),* 243 B.R. 498, 509 & n. 9 (Bankr.N.D.Ala.1999) (citing a litany of bankruptcy court authority factoring non-debtor spousal income into "undue hardship" determinations). Whether a court should consider the income of a debtor's domestic "life partner" when making such a determination is less clear. But courts must consider the total picture of a debtor's household finances in making a § 523(a)(8) determination. *See Greco,* 251 B.R. at 679. As the *Greco* court noted:

In a variety of contexts, bankruptcy courts take into account the income of a debtor's non-filing spouse *or co-habitant* because it is necessary to evaluate a debtor's ability to repay her financial obligations, e.g., in ascertaining a debt-

or's disposable income for purposes of 11 U.S.C. § 1325(b)(1)(B), *see In re Rothman,* 204 B.R. 143, 159–60 (Bankr. E.D.Pa.1996), and cases cited therein; and in making the determinations of a debtor's ability to pay a divorce property settlement obligation under 11 U.S.C. § 523(a)(15), *see In re Koons,* 206 B.R. 768, 773 (Bankr.E.D.Pa.1997), and cases cited therein; and *In re Halper,* 213 B.R. 279, 284 (Bankr.D.N.J.1997).

*Id.* (emphasis added).

"[M]any courts have held that the income of other relatives or of a live-in companion of a debtor is relevant." *Id.* For example, in *Archibald v. United Student Aid Funds, Inc. (In re Archibald),* 280 B.R. 222 (Bankr.S.D.Ind.2002), the bankruptcy court considered the substantial income of the 46–year old debtor's long term live-in boyfriend in considering household income and expenses for purposes of its undue hardship determination. *Id.* As another court pointed out, "[i]n including the live-in boyfriend in *Archibald,* the court impliedly recognized that he had essentially taken on the role of a spouse when it came to the financial affairs involving himself and the debtor. It is very reasonable to expect a spouse, or in certain circumstances a live-in boyfriend or girlfriend, will contribute to the debtor's monthly expenses and, therefore, free up funds to be used to repay the student loan." *See Norris v. Educ. Credit Mgmt. Corp. (In re Quarles),* 2004 WL 2191608, 2004 Bankr.LEXIS 1454 (Bankr.D.Kan.2004).

■ The case before us is like *Archibald,* but more compelling. Rene expressly has "taken on the role of a spouse."

---

14. We recognize that AES/PHEAA's passive, understated approach made the trial judge's job more difficult than necessary. Although it had no obligation to run the risk of shoring up Lorenz's case by examining Rene about his finances, the court would have benefitted from more articulate post-trial argument.

Although Rene has no legal obligation to repay the debtor's student loans, he substantially subsidizes Lorenz's lifestyle. His income has a substantial effect on the debtor's actual or necessary expenses, and should have been taken into account in the undue hardship determination.[15]

■ Having affirmatively established the nature, extent, and duration of his relationship with Rene, it was Lorenz's burden to prove undue hardship taking Rene's finances into account. Insufficient evidence was proffered for the court to do so. The consequences of that failure must rest upon Lorenz, who bore the burden of proof.[16] As a consequence, it was error for the court to conclude it would be an undue hardship to except the guaranteed loans from discharge.

Even were we to ignore Rene and focus on Lorenz's resources and prospects alone, we would reverse the bankruptcy court. The court considered Lorenz's post-graduation income at two levels—the lower based on Lorenz's prognostication ($46,-000) and the higher based on government statistics ($55,140). If one ignores the $150 monthly "vehicle repair and/or replacement" expense added by the court (and for which there is no supporting record evidence), Lorenz would have sufficient funds to make monthly payments on the guaranteed loan shortly after entering the workforce.[17] Moreover, the court did not factor in Lorenz's expectation of overtime pay and gave only cursory treatment to the question whether Lorenz's nursing income would increase over time. Its calculation took no account of that likely eventuality.

No further discussion is necessary. Taken alone, or, more properly, in the context of his household, Lorenz's circumstances do not portray financial inability to pay the guaranteed loan. Such an inability is the cornerstone of both *Brunner* and the "totality of the circumstances" test. The guaranteed loan cannot be discharged.

### CONCLUSION

For the reasons set forth above, we **REVERSE** the judgment of the bankruptcy court.

---

**15.** Our conclusion on this point is not radical. We recognize that a broad spectrum of relationships may place non-spouses under the same roof as a student loan debtor—from visitor to roommate to domestic/life partner. Not all such relationships trigger the necessity of folding the household-mate's finances into the undue hardship equation. Such arrangements must be evaluated case-by-case. In this case, there can be no doubt that Lorenz and Rene have so entwined their affairs as to require that Rene's resources be considered if anything approaching a fair picture of Lorenz's circumstances is to be had.

**16.** Lorenz called Rene to the stand, but elicited no testimony from him regarding his income.

**17.** Although such an expense item (over and above Lorenz's $200 monthly transportation budget) seems commonsensical, no evidence supports it. In no way is it within the scope of permissible judicial notice. *See* Fed. R.Evid. 201.