**EDUCATIONAL CREDIT MANAGEMENT CORPORATION, Appellant,**

v.

**Denise Megan BRONSDON, Appellee.**

**C.A. No. 09–10336–MLW.**

United States District Court, D. Massachusetts.

Nov. 20, 2009.

John F. White, Jr., Topkins & Bevans, Braintree, MA, Troy Gunderman, Educational Credit Management Corporation, Oakdale, MN, for Appellant.

Denise Megan Bronsdon, Stoughton, MA, pro se.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

## I.  SUMMARY

This appeal arises out of debtor Denise Megan Bronsdon's adversary proceeding seeking a discharge of student loans owed to Educational Credit Management Corp. ("ECMC") on the ground of undue hardship pursuant to 11 U.S.C. § 523(a)(8). The Bankruptcy Court concluded that repayment of the student loans would impose an undue hardship and discharged the loans.

ECMC's appeal raises several issues. First, it contends that some of the factual findings that were important to the Bankruptcy Court's undue hardship conclusion were clearly erroneous.  Most significantly, ECMC asserts that there was not ade-

quate support for the findings that Bronsdon has made good faith efforts to find work and that she is not likely to earn income in the future. These contentions are incorrect. There was ample evidence for the Bankruptcy Court to have concluded that Bronsdon is an industrious individual, who would work if she could but, despite her best efforts, has at age 64 been unable to obtain employment and her prospects for earning income are not promising.

ECMC also argues that the Bankruptcy Court made two related errors of law concerning the William D. Ford Federal Direct Loan Program's Income Contingent Repayment Plan (the "ICRP"). These contentions are correct. The Bankruptcy Court concluded that participation in the ICRP would necessarily result in a significant tax being imposed on Bronsdon if her student loan is fully discharged after 25 years of participation in that program. That conclusion is erroneous as a matter of law. Moreover, when the interaction of the ICRP and the tax code is properly understood, it seems, as a matter of fact, unlikely that Bronsdon will owe any taxes if the loan is discharged in 25 years.

The Bankruptcy Court also erred in finding that because participation in the ICRP is voluntary it was not required to give weight to the fact that Bronsdon would not now be obligated to make any annual repayments if she participated in it. While the opportunity to participate in the ICRP would not necessarily foreclose a finding of undue hardship, the immediate effect of participation must be considered in determining whether the debtor has established the truly exceptional circumstances necessary to prove that a discharge based on undue hardship is justified.

In view of the foregoing, this case is being remanded to the Bankruptcy Court for further consideration of the impact of the effect that participation in the ICRP would have on the undue hardship analysis.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Facts*

The following facts were found by the Bankruptcy Court in its January 13, 2009 Memorandum of Decision. *See generally Bronsdon v. Educational Credit Management Corporation,* Bankruptcy No. 07–14215–JR, 2009 WL 95038 (Bankr.D.Mass. Jan.13, 2009).

At the time of trial in January, 2009, Bronsdon was 64 years old and unmarried. *Id.* at *1. Bronsdon did not have any dependents. Nor did she suffer from any disability or debilitating medical condition.

Bronsdon was previously married to a farmer and, during the marriage, sometimes operated a tractor and ran the family farm stand. *Bronsdon,* 2009 WL 95038, at *1. Bronsdon also worked as a secretary. *Id.* In 1994, Bronsdon at the age of 50 received a B.A. from Wellesley College where she majored in English. *Id.*

Beginning in 1996, Bronsdon worked full-time as a legal secretary in the patent prosecution field. *Id.* Bronsdon worked at various firms in that capacity until some point in 2001. *Id.* Her annual salary as a legal secretary increased over time from $40,000 to $57,000. *Id.*

After leaving her last full-time job as a legal secretary in 2001, Bronsdon was unable to find work. *Id.* Bronsdon decided to go to law school and enrolled in Southern New England School of Law in 2002. *Id.* She graduated in the top half of her class in December, 2005. *Id.* In order to attend law school, Bronsdon took out the student loans now at issue, which at some point were assigned to ECMC. *Id.* As of

September 8, 2008, the loans totaled $82,049.45. *Id.*

After law school, Bronsdon failed the bar exam three times, each time by a significant margin. *Id.* at *2. She does not plan to take the bar exam again because she has no money to pay for the exam fee or preparation materials, and because she has not come close to passing. *Id.*

Since graduating from law school, Bronsdon has worked briefly as a receptionist and as a temporary patent prosecution secretary at two different law firms. *Id.* Working as a temporary patent prosecution secretary, she earned an hourly wage of $20–$23. *Id.* Through the fall of 2008, Bronsdon was continually going on interviews and making telephone calls in an attempt to find any kind of secretarial, receptionist, or contract manager work. *Id.* She also spoke with employment agencies. *Id.* However, she was unable to find employment. *Id.*

Because Bronsdon was unable to find employment, she pursued alternate means of earning income. *Id.* She wrote a novel but has not been able to find a publisher. *Id.* She also applied for a patent on an invention to protect the privacy of hospital patients. *Id.* At the time of trial, Bronsdon had not received a response regarding the patent, and was considering writing another novel or starting a website that would feature commentary on current events. *Id.*

At the time of trial, Bronsdon's only income was a monthly Social Security payment of $946. *Id.* at *3. She owned no real property and lived temporarily in her father's house. *Id.* at *2. She will be required to find a new place to live when that house is sold, although it is not clear when that sale will occur. *Id.* She asserted monthly expenses of $826, but, because she stayed with a family member, the figure for her monthly expenses did not in-clude any costs for rent, electricity, water, or heat. *Id.* at *2 n. 4.

### B. *Procedural History and Bankruptcy Court Decision*

Bronsdon filed this adversary proceeding in March, 2008. Compl. at 1. In the complaint, Bronsdon stated that she had received a discharge of other debts through Chapter 7 bankruptcy in December, 2007, but did not receive a discharge of the student loan debt at that time because she failed to file an adversary proceeding as part of the bankruptcy. *Id.* at 2. The Bankruptcy Court held a trial on this matter on January 6, 2009. Jan. 6, 2009 Tr. at 1. Bronsdon was the only witness at the trial. *Id.* at 2.

In a January 13, 2009 Memorandum of Decision, the Bankruptcy Court applied the totality of the circumstances test. *Bronsdon*, 2009 WL 95038, at *3. The Bankruptcy Court first found that Bronsdon's reasonably necessary living expenses were, at a minimum, $1,686.31 per month, which included both the expenses submitted into evidence by Bronsdon and certain upward adjustments by the Bankruptcy Court. *Id.* at *3–4. The Bankruptcy Court next found that these expenses far exceeded Bronsdon's income of $946 per month. *Id.* at *4. The Bankruptcy Court then found that, given Brondson's lack of recent work history, narrow work experience, failure to pass the bar exam, age, unsuccessful attempts to find employment in a variety of fields, and unsuccessful attempts to sell a novel and acquire a patent, Brondson had no reasonably reliable future financial resources other than the Social Security payments. *Id.* at 5. Consequently, the Bankruptcy Court concluded that repayment of the student loans would cause her an undue hardship. *Id.* at *6.

The Bankruptcy Court recognized that, if Bronsdon participated in the ICRP, her current financial status would result in her owing no monthly payments for her student loans. *Id.* at *4. However, the Bankruptcy Court assigned no weight to the availability of the Ford Program in its analysis of undue hardship, in part because "the student loan forgiveness at the conclusion of her participation in the program would result in a tax liability that would subject [Bronsdon's] Social Security benefits to garnishment," which would "promote a vicious cycle that could leave [Bronsdon] in a financial state much more desperate than the one she is currently enduring." *Id.* Additionally, the Bankruptcy Court referred to its reasoning in *In re Denittis*, 362 B.R. 57, 64–65 (Bankr. D.Mass.2007), in which it concluded that consideration of the ICRP in the undue hardship analysis would, in effect, foreclose a conclusion of undue hardship whenever a debtor is eligible to participate in the ICRP. *Bronsdon*, 2009 WL 95038, at *4.

On January 20, 2009, ECMC filed notice of appeal. On April 6, 2009, ECMC filed a Brief for the Appellant ("ECMC's Brief"), raising certain issues. After the appeal was fully briefed, a hearing was held on November 19, 2009.

## III. DISCUSSION

### A. *Standard of Review*

■ "On intermediate appeal to a district court, a final order of the bankruptcy court is subject to the same familiar standards of review normally employed in direct appeals to the courts of appeals in civil cases generally. The district court accepts all bankruptcy court findings of fact unless 'clearly erroneous,' but reviews rulings of law de novo." *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992) (citing Fed. R. Bankr.P. 8013 and *Bartmann v.*

*Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir.1988)).

"The bankruptcy court findings will be considered clearly erroneous if, after a review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." *Bezanson v. Thomas (In re R & R Associates of Hampton)*, 402 F.3d 257, 264 (1st Cir.2005) (citation and internal quotation marks omitted). "[W]here the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error." *In re Tully*, 818 F.2d 106, 109 (1st Cir.1987)(internal quotation marks omitted).

### B. *Undue Hardship*

■ The discharge of debt through bankruptcy does not include the discharge of obligations to repay student loans "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor bears the burden of proving undue hardship. *In re Nash*, 446 F.3d 188, 190–91 (1st Cir. 2006). "The ultimate question of law—whether [the debtor] proved 'undue hardship'—is subject to de novo review." *Id.* at 191.

In attempting to prove undue hardship, a debtor:

has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence.

*Nash,* 446 F.3d at 191. Proof of undue hardship is generally found only in "truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents." *T.I. Fed. Credit Union v. DelBonis,* 72 F.3d 921, 927 (1st Cir.1995).

To determine the existence of undue hardship, courts apply two methods of analysis. *Nash,* 446 F.3d at 190. As the First Circuit noted in *Nash:*

> [N]ine circuit courts of appeal . . . have followed the Second Circuit's test set forth in *Brunner v. New York State Higher Educ. Servs. Corp.,* 831 F.2d 395 (2d Cir.1987)(per curiam). This is a tripartite test, requiring that the debtor show inability, at her current level of income and expenses, to maintain a minimal standard of living; the likelihood that this inability will persist for a significant portion of the repayment period; and the existence of good faith efforts to repay the loans. *Id.* at 396.

> A facially different test is the Eighth Circuit's totality-of-circumstances test, which would have courts consider the debtor's reasonably reliable future financial resources, his reasonably necessary living expenses, and "any other relevant facts." *See Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 554 (8th Cir.2003).

446 F.3d at 190.

The First Circuit has not stated a "preferred method of identifying a case of 'undue hardship.'" *Id.* However, in *Nash,* the First Circuit held that "[u]nder any test assessing eligibility for discharge of student loan debt, [the debtor] must show that her current inability to maintain a minimal standard of living if forced to repay the debt will continue into the future." *Id.* at 192.

In the instant case, the test to be applied is not a material issue. The result is the same under both tests.

C. *The Bankruptcy Court's Findings of Fact Are Not Clearly Erroneous*

Bronsdon was required to prove the necessary facts by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Other than issues related to the ICRP (which is addressed below), ECMC essentially contests three general findings of fact: (1) that Bronsdon's reasonably necessary living expenses are about $1,686.31 per month; (2) that Bronsdon's reasonably reliable future income is limited to her Social Security payment of $946 per month, in part based on her limited job experience; and (3) that Bronsdon made good faith efforts to earn income. As explained earlier, the court reviews these findings for clear error. The Bankruptcy Court's findings of fact after a trial "must stand if reasonably supported." *Nash,* 446 F.3d at 191. Here, there was no clear error.

■ With respect to expenses, the Bankruptcy Court did not err when it adjusted Bronsdon's car maintenance figure upward from $8.50 per month to $68.81 per month to reflect a $723.75 brake repair required earlier in the year. The Bankruptcy Court's finding has support in the record, as Trial Exhibit F specifically reflects Bronsdon's uncontested claim that she pays $8.50 per month in car maintenance but that that figure did not include the $723.75 in brake repair. The Bankruptcy Court reasoned that Bronsdon's actual car expenses would most accurately be calculated if single, large expenses, such as the brake repair, were divided by 12 and added into the monthly routine maintenance figure. Such a finding is firmly grounded in the actual expenses

reflected in the record and is not, therefore, clearly erroneous. The cases relied upon by ECMC do not hold otherwise, but rather relate to instances in which there were no past expenses in the record upon which to base the estimate. *See In re Smith,* 328 B.R. 605, 613 (1st Cir. BAP 2005)(holding imputation was not proper when the record did not show that such expenses had been incurred in the past); *In re Lorenz,* 337 B.R. 423, 433 (1st Cir. BAP 2006)(same).

Moreover, ECMC does not contest the imputation of an additional $800 per month based on Bronsdon's testimony that she would soon have to start paying rent. *Bronsdon,* 2009 WL 95038, at *4. Consequently, as this uncontested rent figure raises Bronsdon's expenses well over her Social Security income of $946 per month, the car maintenance figure is not material in any event. *See id.*

ECMC challenges the Bankruptcy Court's findings related to Bronsdon's failure to pass the bar exam, which precludes work as an attorney. Bronsdon testified without contradiction that she failed the exam three times by a substantial margin. Therefore, the findings that she will not pass in the future and will not work as an attorney are not clearly erroneous.

ECMC challenges the Bankruptcy Court's conclusion that Bronsdon is unlikely to work in any capacity in the future. ECMC does this in various ways, such as challenging the Bankruptcy Court's findings: (1) that Bronsdon's work experience between 1996 and 2001 is limited when compared to other candidates for similar employment; (2) that Bronsdon will not find any kind of secretarial, receptionist, or contract manager work; and (3) that Bronsdon's age substantially decreases the likelihood that she will find employment. ECMC also challenges reliance on Bronsdon's age as an indicator of earning capaci-

ty and cites cases, such as *In re Spence,* 541 F.3d 538 (4th Cir.2008), in which age was not considered to be a decisive factor. However, by focusing on individual findings of the Bankruptcy Court, ECMC ignores the Bankruptcy Court's central finding, which was not merely that Bronsdon is an older debtor, but rather that Bronsdon is primarily qualified to be a secretary and in this field age is such a liability that an applicant in her mid–60s has no reasonable chance of being hired. *See Bronsdon,* 2009 WL 95038, at *5–6.

The record shows a pattern of gradually decreasing employability followed by prolonged unemployment, despite a broad and vigorous job search and increasing education and work experience. As described earlier, while in her mid–50's, Bronsdon worked as a legal secretary from 1996 to 2001 at various law firms. In 2001, she was involuntarily terminated from her job and was not able to find another job in that field. After graduating law school in December, 2001, at the age of 61, she worked only briefly at temporary jobs as a receptionist or secretary at several law firms. She applied to numerous potential employers and looked for any kind of receptionist, secretarial, or contract manager job. However, by late fall of 2008, at the age of 64, she had not found work.

■ In view of these facts, the Bankruptcy Court reasonably found that Bronsdon will not be able to find a secretarial or any other job. The essentially uncontradicted testimony does not leave the court "with the definite and firm conviction that a mistake has been committed." *Bezanson,* 402 F.3d at 264 (citation and internal quotation marks omitted). Accordingly, the Bankruptcy Court's conclusion that Bronsdon is not likely to find paid employment in the foreseeable future is not clearly erroneous. *See Bronsdon,* 2009 WL 95038, at *5–6.

With respect to good faith, ECMC argues that the novel and the patent were not pursued in good faith because, as the Bankruptcy Court found, the income from these endeavors is speculative. However, the record indicates that Bronsdon seriously pursued both projects. For the novel, for example, she solicited input from other authors, registered a copyright, and contacted 13 publishers or agents. *See* Jan. 6, 2009 Tr. at 11; Trial Ex. H. Consequently, it was not clear error for the Bankruptcy Court to conclude that these attempts were made in a good faith effort to acquire income to repay the loan, despite the fact that any income from these efforts was necessarily speculative. *Bronsdon*, 2009 WL 95038, at *5.

ECMC also suggests that Bronsdon demonstrated a lack of good faith when she failed to seek jobs outside of her field of expertise. Bronsdon testified that she had been actively seeking work in the secretarial field or related employment until shortly before the January, 2009 trial. As Bronsdon had made a diligent search for work for which she was qualified by experience, it was not clear error to find that Bronsdon's failure to attempt to obtain other types of work did not mean that she had failed to make a good faith effort to find employment.

D. *The Bankruptcy Court Made a Legal Error Regarding the ICRP*

The Bankruptcy Court found that Bronsdon was "aware of the [ICRP]" and concluded that if she "were to participate in the [ICRP], her current financial status would not require monthly payments." *Bronsdon*, 2009 WL 95038, at *4. Under the ICRP, the annual amount payable by a borrower is no more than 20% of discretionary income, where discretionary income is defined as the difference between adjusted gross income and the poverty level. *See* § 685.209(a)(2)(ii), (3). The maximum repayment period under the ICRP is 25 years, after which time any remaining debt is forgiven. *See* § 685.209(c)(4)(i). Unpaid interest is capitalized "until the outstanding principal amount is 10% greater than the original principal amount." § 685.209(c)(5). In effect, the Bankruptcy Court found that Bronsdon's income is below the poverty level and, therefore, Bronsdon would not be obligated to pay anything annually under the ICRP unless Bronsdon's income increased at some point in the future. However, the Bankruptcy Court relied on two legal conclusions to decide that the availability of the ICRP should not be given weight in the undue hardship analysis. *Bronsdon*, 2009 WL 95038, at *4.

First, the Bankruptcy Court held that Bronsdon's "participation in the program would result in a tax liability that would subject [her] Social Security benefits to garnishment." *Id.*

Second, the Bankruptcy Court cited its reasoning in *In re Denittis*, 362 B.R. at 64–65, in which the court held:

Most troubling about ECMC's attempts to force the Debtor into the Ford program, however, is that such use of the program removes from this Court's consideration the very issue Congress entrusted to the Court, namely the repayment of the debt would impose an undue hardship. *To hold that debtors must participate in the Ford program, if eligible, would be no more than the Court abdicating its responsibility to determine the dischargeability of a student loan.* If this is the outcome Congress intended, it would have said so, especially since Congress undertook a major revision to the Bankruptcy Code in the BAPCPA. Although there may be instances in which a debtor's *voluntary* participation in the Ford program is the

best solution to a debtor's financial predicament, such as when a debtor is temporarily unable to make her full monthly student loan payments, this case does not present such an instance.

*Denittis,* 362 B.R. at 64–65 (emphasis added). In essence, the Bankruptcy Court reasoned that giving any weight to eligibility for the ICRP would, in effect, impermissibly mandate that all eligible debtors participate in the ICRP prior to receiving a discharge through bankruptcy. *See id.*

Both legal conclusions underlying the Bankruptcy Court's decision are incorrect. They are, therefore, insufficient as a matter of law to justify giving no weight to the ICRP in the undue hardship analysis.

First, tax liability is not certain to flow from the discharge of the remaining debt at the end of the 25–year period. 26 U.S.C. § 108(a)(1)(B) excludes from gross income "any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if the discharge occurs when the taxpayer is insolvent," provided that, under § 108(a)(3), "the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent." For the "purposes of [section 108], the term 'insolvent' means the excess of liabilities over the fair market value of assets" at the time immediately before the discharge of the debt. 26 U.S.C. § 108(d)(3); *see Merkel v. Comm'r of Internal Revenue,* 192 F.3d 844 n. 3 (9th Cir.1999) (applying definition).

■ The overall effect of these provisions is that, at the end of the 25–year

period, a participant in the ICRP will experience a taxable event only to the extent that, after the discharge, her assets exceed her liabilities. *See* 26 U.S.C. § 108(a)(1)(B), (a)(3), (d)(3); *Toberman v. Comm'r of Internal Revenue,* 294 F.3d 985, 988 (8th Cir.2002)(quoting *Comm'r v. Tufts,* 461 U.S. 300, 310 n. 11, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983)). Accordingly, it was legal error for the Bankruptcy Court to hold that "participation in the program would result in a tax liability," because any tax liability is strictly contingent on Bronsdon's financial status in the far future.[1] *May v. Texas Higher Educ. Coordinating Bd. (In re May),* 368 B.R. 850, 858 (Bankr.D.Neb.2007)(recognizing, when applying the totality of the circumstances test, that forgiveness of the unpaid balance of the debt at the end of the ICRP period "may or may not result in tax liability for the debtor"). As many courts have recognized, predictions of tax liability at the conclusion of the ICRP period are necessarily speculative. *Jones v. Bank One Texas,* 376 B.R. 130, 142 n. 11 (W.D.Tex.2007)(noting that "forecasting such tax liability under whatever tax laws will be in effect in 25 years is sheer speculation"); *Educ. Credit Mgmt. Corp. v. Stanley,* 300 B.R. 813, 818 n. 8 (N.D.Fla. 2003)(same); *Paul v. Suffolk Univ. (In re Paul),* 337 B.R. 730, 738 (Bankr.D.Mass. 2006) (holding that future tax liability is uncertain because, in 25 years, a debtor might pay off the debt or, if insolvent, might "enter into the offer in compromise program and reach a settlement agreement with the Internal Revenue Service"); *Archibald v. United Student Aid Funds, Inc. (In re Archibald),* 280 B.R. 222, 229

1. Accepting as true the Bankruptcy Court's findings that Bronsdon's expenses will soon "far exceed her income" and that Bronsdon "will also encounter extreme difficulty finding employment in the foreseeable future," it seems probable that Bronsdon's future insolvency will be sufficient to substantially or completely offset any possible future tax liability associated with the discharge of the student loans. However, this court makes no finding on this issue.

(Bankr.S.D.Ind.2002) (stating, in 2002, that "[t]he tax implications of a discharge under the ICRP are speculative at best given that the ICRP is approximately eight years old"). *But see, e.g., In re Durrani,* 311 B.R. 496, 508 (Bankr.N.D.Ill.2004)("However, that discharge of indebtedness, unlike a discharge in bankruptcy, results in income that [debtor] would have to recognize for taxable purposes."), *aff'd,* 320 B.R. 357 (N.D.Ill.2005); *In re Korhonen,* 296 B.R. 492, 496–97 (Bankr.D.Minn.2003)("[T]he amount discharged would be considered taxable income."); *In re Berscheid,* 309 B.R. 5, 14 (Bankr.D.Minn.2002) ("Unless [debtor] significantly increases his income, he would go to his grave either indebted to ECMC or, if not, indebted to the IRS on the tax obligation incurred when ECMC forgives the unpaid loan.").[2]

Second, contrary to the Bankruptcy Court's reasoning, consideration of the ICRP would not impermissibly diminish the authority of the Bankruptcy Court by precluding discharge based upon undue hardship whenever a debtor is eligible for, but did not participate in, the ICRP. *See Bronsdon,* 2009 WL 95038, at *4. (citing *Denittis,* 362 B.R. at 64–65). Applying the *Brunner* test, three circuit courts of appeals have concluded that eligibility for the ICRP should be considered as a component of the undue hardship analysis but is not necessarily dispositive. *In re Mosko,* 515 F.3d 319, 326 (4th Cir.2008)(holding that seeking out loan consolidation options such as the ICRP is "an important component of the good faith inquiry" under the *Brunner* test); *In re Alderete,* 412 F.3d 1200, 1206 (10th Cir.2005)(agreeing with the court below that participation in the ICRP is "an important indicator of good faith"); *In re Tirch,* 409 F.3d 677, 682–83 (6th Cir.2005)(stating that failure to take advantage of the ICRP is "not a per se indication of a lack of good faith," but is "probative of [a debtor's] intent to repay the loans"). Applying the totality of circumstances test, the Bankruptcy Appellate Panel of the Eighth Circuit also found eligibility for the ICRP to be relevant but not necessarily dispositive. *In re Parker,* 328 B.R. 548, 552 (8th Cir. BAP 2005)(holding that a debtor's ability to make reduced payments under the ICRP is relevant to the inquiry of whether the debtor's reasonable future financial resources will cover payment of the debt while still allowing a minimal standard of living). This court has previously also held that consideration of the ICRP is an important component of the undue hardship analysis. *See State Univ. New York–Student Loan Serv. Ctr. v. Menezes,* 352 B.R. 8, 15, 17 (D.Mass.2006).

The mere availability of the ICRP does not mandate a conclusion that undue hardship is absent. *See In re Lee,* 352 B.R. 91, 95–96 (8th Cir. BAP 2006)(holding that the availability of the ICRP is "but one factor to be considered in determining undue hardship, but it is not determinative"); *Jones v. Bank One Texas,* 376 B.R. 130, 142 (W.D.Tex.2007)(holding, when applying the *Brunner* test, that "[w]hile not a per se indication of a lack of good faith, [debtor's] decision not to take advantage of the ICRP is probative of her intent to repay the loans"). There are possible circumstances in which even the relatively lenient terms of the ICRP would impose, or contribute to creating, an undue hard-

---

**2.** It is possible that if Bronsdon enrolls in the ICRP she will be able to file a new adversary proceeding, pursuant to 11 U.S.C. § 523(a)(8), to have her debt discharged if as the end of the 25–year period approaches it appears she will have a substantial tax liability that she would have difficulty paying. *See Nash,* 446 F.3d at 194. However, the court has not relied on this legally uncertain possibility in reaching its decision.

ship. *See Lee,* 352 B.R. at 96 (holding even minimal payment required by the ICRP could be beyond the debtor's means). There may also be circumstances in which a failure to participate in the ICRP is outweighed by other factors in the undue hardship analysis, perhaps including the adverse effect of the existence of the debt on a debtor's credit rating or harm to the debtor's mental health. *See id.* at 96 and n. 12 (stating totality of circumstances test also considers factors beyond debtor's ability to pay, such as mental health).

In essence, eligibility for the ICRP does not foreclose the possibility of discharge based on undue hardship by the Bankruptcy Court. Nor, however, does the fact that participation in the ICRP is voluntary mean that a debtor's decision not to participate must not be considered and given weight in the undue hardship analysis. The proper place of ICRP eligibility lies between these two extremes. The decision whether to discharge in a case where a debtor is eligible but declines to participate in the ICRP must be the result of an individualized analysis in which the ICRP is given weight but for which no particular outcome is prescribed.

As described earlier, the First Circuit has held that a debtor seeking discharge "has a formidable task" and that "the interest in ensuring the continued viability of the student loan program takes precedence" over "the general purpose of the Bankruptcy Code to give honest debtors a fresh start." *Nash,* 446 F.3d at 191. It would be inconsistent with that principle to categorically eliminate from the analysis a program to restructure the debt that would result in no foreseeable payments and only a speculative cost to the debtor at some time in the distant future. Here, however, the Bankruptcy Court's incorrect legal conclusions caused it to discount the present effect of the ICRP entirely and to give no weight to the availability of the program as a factor in the undue hardship analysis. Accordingly, in view the heavily fact-dependent nature of the undue hardship inquiry, the judgment of the Bankruptcy Court is being vacated and the case is being remanded for further proceedings to determine whether undue hardship exists in view of the fact that (a) participation in the ICRP will not necessarily, or even likely, result in any tax liability, and (b) the availability of the ICRP option must be considered and given some weight without necessarily being decisive.

## IV. ORDER

Accordingly, it is hereby ORDERED that:

1. The decision of the Bankruptcy Court is VACATED.

2. This case is remanded to the Bankruptcy Court for further proceedings consistent with this Memorandum and Order.