Jeffrey J. Graham, United States Bankruptcy Judge
This matter comes before the Court on Defendant United States of America Department of Education's (the "United States" or "DOE") Motion for Summary Judgment (the "Motion") on Debtor/Plaintiff Leta Marie Echelbarger's Complaint to Determine Dischargeability of Student Loans (the "Complaint"). For the reasons stated below, the Court GRANTS the Motion.
Undisputed Facts
The designated evidence reveals the following undisputed facts:
1. Debtor Leta Marie Echelbarger ("Debtor") is a healthy 41-year old woman.
2. After attending Brebeuf and Muncie Burris High School, Plaintiff was selected to attend Indiana Academy for Science, Mathematics, and Humanities, a boarding school for gifted juniors and seniors. While at Indiana Academy, Debtor lived on Ball State University's ("BSU") campus and was able to take college courses for credit.
3. After graduating from the Indiana Academy in 1995, Debtor attended Marquette University on a scholarship.
*42 4. Debtor dropped out of Marquette after a year because, as she put it: "I was stupid and 18 and decided that working sounded better."
5. Debtor then returned to Muncie, where she worked a variety of jobs. At the age of 20, she opened a small retail store on BSU's campus, but the business did not succeed. She filed for bankruptcy in 2004 because she "was not business savvy enough to create a good business model, and it wasn't the right fit to work on a college campus."
6. Between 1998 and 2005, Debtor took out student loans to pursue an ungraduated degree at BSU. She admitted that she "wasn't serious" when she took the classes and that she withdrew for a few semesters upon the birth of her first and only child, a son named EJ. She further admitted that "it took a little while to get serious" and that it "wasn't until I hit about my mid-20s that I was like, you know, I need to do something more ...."
7. After finally completing her undergraduate degree in 2005, Debtor immediately began her first master's program in special education at BSU. She completed that program in December, 2006.
8. Debtor immediately began a second master's program in educational administration and supervision, again at BSU. Debtor indicated that she pursued this degree because she wanted to do "something past teaching" and because "in order to get a principal's position anywhere, you need at least a master's, if not a doctorate."
9. Upon completion of her second master's degree, Debtor immediately began working toward a doctorate in education "in case she ever wanted to go into superintendency or something like that" or if she has "wanted to pursue being a college professor." As she began this program, she "thought that the upward mobility in education was what [she] wanted."
10. Debtor never completed her doctorate program. She was enrolled in the program until 2010 until 2015, when she "timed out" after she failed to complete the field work needed for her dissertation. At that time, she had completed all of her coursework and written part of her dissertation and defended it to her doctoral committee. All that remained to be completed were the final two chapters of her dissertation.
11. Debtor admits that the last few years she was enrolled "were stagnant" but she continued to pay tuition-and incur additional student debt-during those years.
12. Debtor has contacted other schools to see if she could transfer her credits in an effort to complete her doctorate, but each school has refused to transfer more than a fraction of her credits.
13. After earning her undergraduate degree, Debtor was able to obtain an emergency teaching license.
14. Debtor began teaching at Richmond High School in 2006 and continued with that employment for six years.
15. In 2012, after completing her coursework and obtaining a principal's license after passing the state exam, Debtor obtained a position as principal at Damar Charter Academy ("Damar"). As principal, she earned approximately $ 82,000 per year.
16. Debtor left Damar after two years because "[t]he schools was a mess because it was brand new." She described her decision to leave as "kind of a peace-of-mind move."
17. Debtor then took a position as vice-principal at Providence Cristo Rey High *43 School ("Providence") in 2014. Her salary at the time was approximately $ 75,000.
18. Debtor left Providence after three years, in July of 2017, when her contract was not renewed. Debtor has described Providence as a "hostile work environment" and states that she was "targeted because the new principal, I think, felt threatened that I had been there a couple of years, and he was new."
19. Because Debtor's contract was not renewed late in the year, she found it difficult to find another position for the 2017-2018 school year.
20. Debtor's contract with Providence provided that such a decision was supposed to be made earlier in the year. Debtor considered taking legal action because of this alleged breach and disclosed the claim in her bankruptcy schedules.
21. Debtor ultimately decided not to pursue another job in school administration or teaching as she no longer wanted to work in education. This included applying for her former position at Damar, although she admitted that the position was a possibility.
22. Debtor was unemployed from July to November of 2017. She then accepted a job with Indiana Professional Management Group, where she earned approximately $ 30,000 a year plus mileage. In that job, Debtor worked as a case manager for people with disabilities on the Medicaid waiver.
23. Debtor described the position as "[v]ery close" to her dream job and that she is very happy with what she is doing.
24. Plaintiff filed this adversary proceeding on August 3, 2018. In the Complaint, Debtor alleges that her household net income is $ 1,807.45.[1] However, just 10 days after filing the Complaint, Debtor began a new job at CRF First Choice, where she continues to work with people with disabilities. In this position, Debtor earns $ 45,000 per year, plus mileage, for a total of approximately $ 50,000 per year.
25. Debtor knew that she was starting a new job when she filed the Complaint.
26. Debtor's current gross income is approximately $ 4,075 a month, an increase from the $ 1,615.00 listed on her bankruptcy schedules. According to the United States' analysis, Debtor's current expenses leave Debtor with approximately $ 749.45 in disposable monthly income. Debtor disputes that figure.[2]
27. Debtor insists on remaining in her current position because she enjoys her work. To Debtor, "having that peace of mind is a lot more fulfilling than a little bit of extra money." Debtor adamantly refuses to return to the education field, despite that fact that she could potentially earn more money. She insists that her "mental state" is more important than salary. Debtor has explained that education is "not a good fit" for her and that even in a good work environment, "[e]verything right now is very test-oriented and not *44 looking at the best interest of the kids, and it's very disheartening."
28. Debtor also believes that, as a white woman, she was not considered for positions because of her gender and color.
29. Debtor does not believe her income will increase going forward if she stays with CFR First Choice.
30. Debtor is planning on letting her professional licenses lapse.
31. Debtor took out a significant amount of federal student loans to fund her lengthy education. As relevant to this proceeding, the Department of Education disbursed funds from two direct loans to Debtor, one for $ 71,967 and another for $ 181,539.70 (collectively, the "Loans"), that allowed Debtor to consolidate her outstanding student loans.
32. As of August 29, 2018, Debtor owed $ 276,457.13 in principal on the Loans and $ 2,559.10 in interest, for a total debt of $ 279,016.23 (the "Debt").
33. Debtor admits the Loans were taken out for educational purposes.
34. Debtor has made payments of $ 4,336 toward her the Loans. However, it is not clear from the designated evidence how many payments Debtor has made, in what amount or at what intervals.
35. Debtor was able to have $ 17,500 of the Loans forgiven through the Department of Education's loan forgiveness program by teaching at a "Title 1" school.
36. Debtor also jointed the Army National Guard, for which she was promised $ 50,000 in loan forgiveness if she completed five years of service. Debtor sought a hardship discharge from the National Guard in 2013 after two and one-half years of service and ultimately did not benefit from this program.
37. Debtor sought a hardship discharge because her unit was deploying to Afghanistan, and she did not have child care because her parents were unwilling to care for her son. In her letter seeking a hardship discharge from the National Guard, Debtor also stated that her "civilian career has taken an exceptional turn" and that she had received a significant promotion [as principal at Damar] which put her "exactly where [her] goals are to be long-term, hopefully permanently." Debtor emphasized that she "love[d]" her job at Damar.
38. Debtor owns a home in the Broad Ripple neighborhood of Indianapolis that is valued at $ 181,000. She had approximately $ 37,000 of equity in her home at the time she filed for bankruptcy. She has lived in the home approximately six years.
39. While Debtor often referred to her mental state and to her peace of mind, she has offered no evidence that she suffers from a disease or disability. She took an antidepressant for a period of time because of work-related stress.
40. Debtor makes significant contributions to charity. Over the past five years, those annual contributions have ranged from $ 1,500 to $ 8,000. Some of those contributions are made in the form of donated goods. She indicates she does not "have the time or patience" to sell them instead of donating them.
41. Debtor's only child is now 20 years old and continues to live with Debtor. He is not currently attending college, nor has he applied for college. He currently works at Jimmy John's, where he makes approximately $ 750-$ 800 a month. He is not required to pay rent or otherwise contribute the household expenses. He does, however, pay for his own cell phone and gas.
42. Debtor's son attended private or parochial schools for the better part of his secondary education, at considerable expense to Debtor.
*45 43. Debtor had historically contributed toward her retirement, even when she was not earning a high salary.
44. Debtor and her son spend a significant amount on their cell phones. Together, their monthly service is $ 230 a month, along with the cost of the phones themselves.
45. Debtor spends $ 86 a month on satellite television and approximately $ 800 a year on acrylic nails which Debtor a "necessity" to be "presentable" as she habitually chews her nails.
46. A month after receiving her Chapter 7 discharge, Debtor traveled to Mexico for a vacation that was largely paid for by a friend. While there, Debtor spent $ 650 on a trip excursion.
47. At one time, Debtor was repaying approximately $ 400 a month toward the Loans under an income contingency repayment plan ("ICRP"). More recently, she has refused to make payments under an ICRP, arguing that such participation is futile given the amount of the Loans and that the eventual forgiveness of the Loans under such a plan may lead to a significant tax liability.
48. Outside of an ICRP, her required contractual payment on the Loans would be approximately $ 3,186 per month. Based on her current income, her payment under an ICRP would be approximately $ 165.00.
Discussion and Decision
Summary Judgment Standard
Typically, the court, as trier of fact, hears factual disputes at trial. If there are no factual disputes, summary judgment in lieu of a trail may be appropriate. Summary judgment is not a substitute for trial, but it streamlines the trial process and disposes of actions without a trial where there is no genuine issue as to any material fact. In re Hurricane Tech. Syst. Corp. , 2016 WL 5819790 at*1 (Bankr. D.P.R. Oct. 5, 2016). Summary judgment is appropriate in cases where there is "no genuine dispute as to any material fact" and the "movant is entitled to judgment as a matter of law" under Fed. R. Civ. P. 56, applicable here under Fed. R. Bankr. P. 7056. Celotex Corp v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
When a movant's motion is adequate to support the basis of movant's claims, it is the non-movant's burden to demonstrate a genuine issue of material fact for trial. Crawford v. Countrywide Home Loans, Inc. , 647 F.3d 642, 647 (7th Cir. 2011). A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc. , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While the court views the record in the light most favorable to the non-moving party, the non-moving party must still point to specific evidence that would be admissible at trial, which "could support judgment in [non-movant's] favor" .... Marr v. Bank of Am. , N.A., 662 F.3d 963, 966 (7th Cir. 2011).
The Court notes that pursuant to S.D. Ind. B-7056-1(b), Debtor was required to include in her response brief a section labeled "Statement of Material Facts in Dispute" that identifies the potentially determinative facts and factual disputes that Debtor contends demonstrate a dispute of fact that precludes summary judgment. Debtor's response brief included such a section, but instead of setting forth facts or factual disputes, Debtor merely posed a series of questions,[3] with citations not to *46 designated evidence but to pages within the United States supporting brief.
Some of the questions strike the Court as irrelevant in light of the standard governing § 523(a)(8) actions; with the exception of the first and last of the questions, few seem to relate to the Brunner standard for "undue hardship," set forth below. Other questions are not supported by reference to designated evidence. In total, the section does not, in the Court's view, fully comply with S.D. Ind. B-7056-1(b). While the Court is not inclined to grant summary judgment just on that basis, Debtor certainly made the Court's task of determining whether there is any genuine issue of material fact more challenging.
11 U.S.C. § 523(a)(8)
A discharge under § 727 ... of this title does not discharge an individual debtor from any debt-(8) unless excepting such debtor from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in an obligation to repay funds received as an educational benefit, scholarship or stipend; or any other educational loan that is a qualified loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.
In the Matter of Roberson , 999 F.2d, 1132, 1135 (7th Cir. 1993), the Seventh Circuit Court of Appeals adopted the three-prong test for undue hardship articulated in Brunner v. New York State Higher Educ. Servs. Corp. , 831 F.2d 395, 396 (2d Cir. 1987). Under that standard, a debtor must establish by a preponderance of the evidence that: (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [herself] and [her] dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion for the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans.
As to the first prong of Brunner , the United States' argument is based solely on the $ 165.00 monthly payment Debtor would be required to make under an ICRP. The United States offers no analysis as to whether Debtor could afford to maintain a minimal standard of living if she was forced to pay the Loans under their contractual terms.
The Court rejects the United States' invitation to analyze the first prong of Brunner based on the amount a debtor would be required to pay under an ICRP. The Court finds persuasive the bankruptcy court's discussion in West v. United States Dep't. of Educ. (In re West) , Adv. Pro. No. 17-00078, 2018 WL 846539 (Bankr. W.D. Tenn. Feb. 6, 2018) ). In that case, the debtor's required payment under an IBRP was $ 0 based on his limited income. Rejecting the DOE's argument that the first prong of Brunner be analyzed based on a $ 0 monthly payment, the court stated:
*47 The Court is not sufficiently persuaded at this time by [the DOE's] reasoning. If the first prong of Brunner test automatically prevents any debtor who qualifies for a $ 0 per month payment from discharging a student loan, then 11 U.S.C. § 523(a)(8) would seemingly act as a complete bar to discharging student loans for those debtors in the worst position. For an extreme example, a hypothetical debtor with no arms, no legs, and the inability to speak would also, presumably qualify for a $ 0 per month payment, which would mean that under the [Department of Education's] theory, he could not discharge his loans. Instead he would have to wait 25 years for them to be forgiven. Then, since the IRS treats this loan forgiveness as taxable income, he would find himself owing the IRS. And because the interest continue to accrue, and even capitalizes after a certain point, under [an ICRP] he may very well owe the IRS more than the original student loan.
West , at *3.
Citing the Sixth Circuit's decision in Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett) , 487 F.3d 353, 354 (6th Cir. 2007) -where the court rejected use of an ICRP payment for purposes of Brunner's "good faith" prong-the West court further opined that because a debtor's student loan payment is based off the debtor's discretionary income, the monthly payment will essentially always be low enough [to allow] the debtor to maintain a minimal standard of living. West at *3. "Therefore, under the Brunner test, no debtor would ever qualify to discharge his student loan. But as the Sixth Circuit pointed out in ... Barrett , Congress knew of these programs when it reformed the Bankruptcy Code in 2005 and chose to allow debtors in certain circumstances to discharge student loans." Id.
Under the Loans' contractual terms, Debtor's monthly payment is $ 3,186. Even if Debtor substantially reduced her discretionary spending, it does not appear she could afford to make that payment and still maintain a minimal standard of living given her current income. Based on the foregoing, the United States is not entitled to summary judgment in its favor as to the first prong of Brunner. But while Debtor has satisfied the first prong of Brunner, Debtor has not demonstrated a genuine issue of material fact as to the second and third prongs of the Brunner standard.
The second prong of Brunner requires that Debtor show she is presently unable to repay the debt and that there are "additional, exceptional circumstances" making it improbable she will ever be able to pay. Roberson , 999 F.2d at 1136. This requirement "properly recognizes the potential continuing benefit of an education, and imputes to the meaning of 'undue hardship' a requirement that the debtor show [her] dire financial condition is likely to exist for a significant portion of the repayment period." Id. at 1135. Debtor must show there is a "certainty of hopelessness" in that she will not be able to fulfill her commitment at any point. Id. at 1136. Bankruptcy courts have interpreted this to require "additional circumstances which make it reasonably certain that the debtor's circumstances are unlikely to improve." Nelsen v. Educ. Credit Mgmt. Corp. (In re Nelsen) , 404 B.R. 892, 894-95 (Bankr. E.D. Wis. 2009) (quoting Hoskins v. Educ. Credit Mgmt. Corp. (In re Hoskins) , 292 B.R. 883, 887 (Bankr. C.D. Ill. 2003) ).
In earlier cases, the Seventh Circuit set the bar for the second prong high. In Roberson , the court listed the factors it believed showed a debtor would lack the ability to repay. Roberson , 999 F.2d at 1137 ; see also *48 Goulet v. Educ. Credit Mgmt. Corp. (In re Goulet) , 284 F.3d 773, 778 (7th Cir. 2002). Such factors included psychiatric problems, lack of usable job skills, and severely limited education. Id. In Goulet , a convicted felon with alcohol and substance abuse problems did not establish "additional, exceptional circumstances" necessary to satisfy this prong. Instead, he was "an intelligent man" who did not lack usable job skills and could "apply himself when he desire[d]." Id. at 779. He had "simply failed to diligently pursue employment such that he would be able to alleviate his financial burdens." Id. In Roberson , the debtor had "a bleak forecast for the near future" as he was unemployed, had lost his driver's license after a second drunk driving conviction, and had wrist and back injuries. Roberson , 999 F.2d at 1137. However, those circumstances were only temporary, as his medical condition was not "insurmountable," he would be able to regain his driver's license, and neither the injuries nor the loss of license prevented him from finding employment in the future. Id.
More recently, the Seventh Circuit has shown more compassion in analyzing this prong. In Krieger , the court upheld the discharge of a student loan. The debtor was a 53-year-old living in a rural area who had not held a job since 1986. Krieger v. Educ. Credit Mgmt. Corp. , 713 F.3d 882, 884 (7th Cir. 2013). As the Krieger court put it, "[t]hat's not the sort of background employers are looking for. There is no reason to think that a brighter future is in store." Id.
Even under a less exacting application of the second prong, Debtor has failed to demonstrate that a genuine issue of material fact as to whether the required additional circumstances exist. Debtor's sole argument under the second prong is that she refused to return to a more lucrative job in education because what she is doing now is a better fit. The Court finds Debtor's reasoning unpersuasive.
Debtor's alleged inability to repay the Loans is rooted exclusively in her voluntary choice to abandon the education field. After only two positions in school administration, she has decided that the field is not a good fit for her. This is after she obtained-at great expense and over many years-an undergraduate degree, two master's degrees and a nearly completed doctorate. While the Court appreciates why she faced challenges finding a suitable position for the 2017-2018 school year, her refusal to continue her search for another suitable position in education administration merely because she finds her current, lower paying job a better fit is not the "additional circumstances" required by Brunner . Debtor lives in a large metropolitan area with a number of educational environments. She suffers from no diagnosed medical or mental health condition. She is relatively young, has relevant work experience, and is well educated-with a strong academic record.
It bears emphasizing that Debtor chose to pursue her advanced degrees, in part, to make herself more marketable and to allow for higher earnings. She also opted for a hardship discharge from the National Guard after securing her job at Damar because it was, according to her, the fulfillment of her professional goals and a job that she "loved." She made those decisions without first working extensively in the field. The Court does not doubt that working in education administration can be frustrating, but the evidence before the Court demonstrates that Debtor's choice to leave the field is voluntary and based on a limited amount of experience. This does not rise to the level of hopelessness-even in light of Krieger -that the second prong of Brunner requires. As such, the Court cannot conclude that Debtor has demonstrated *49 a genuine issue of material fact as to the second prong of Brunner . The United States is entitled to summary judgment as to this issue.[4]
Debtor has also failed to demonstrate that a genuine issue of material fact exists as to her good faith efforts to repay the Loans. Courts have measured good faith by examining various factors; the fact debtor has made no payments or has made some payments on the loan is not in and of itself dispositive. Nary v. The Complete Source, (In re Nary) , 253 B.R. 752, 768 (N. D. Tex. 2000) (court may evaluate the debtor's conduct in the broader context of his total financial picture). "Good faith is measured by the debtor's 'efforts to obtain employment, maximize income, and minimize expenses.' " Roberson, 999 F.2d at 1136. Undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from "factors beyond his reasonable control." See also Briscoe v. Bank of New York (In re Briscoe) , 16 B.R. 128 130-31 (Bankr. S.D. N.Y. 1998) (good faith inquiry includes "whether the debtor was negligent or irresponsible in conducting his financial affairs such that the debtor's misfortune is self-imposed"); Perkins v. Vermont Student Assistance Corp. , 11 B.R. 160, 161 (Bankr. D. Vt. 1980) (buying a new car was a "self [-]imposed hardship"); Conner v. Ill. State Scholarship Comm. (In re Conner) , 89 B.R. 744, 749 (Bankr. N.D. Ill. 1988) (finding that debtor imposed hardship upon herself by choosing to send her children to expensive schools).
While neither party has presented the Court with a detailed payment history, the undisputed facts show that Debtor has paid $ 4,336.00 toward the Loans and that she, at least for a time,[5] participated in an IBRP with a monthly payment of $ 400.00. Debtor also had $ 17,500 of the Loans forgiven by teaching at a Title I school. Furthermore, Debtor joined the Army National Guard in an effort to help reduce her indebtedness, although she later sought and obtained a hardship discharge from the National Guard, in part, because she had decided to focus on her job at Damar.
With respect to maximizing her income, the Court has already questioned Debtor's voluntary decision to forego more lucrative employment in the field for which is she educated. After only two positions in education administration over a period of approximately six years, Debtor reached the drastic conclusion that education is simply not a good fit for her, thereby abandoning years of higher education. In so concluding, she took a $ 30,000 to $ 40,000 cut in pay and is now employed in a job with little room for advancement.
The Court finds Debtor's decision to leave education to be hasty at best; feckless at worst. There is insufficient evidence *50 before the Court that Debtor has exhausted available opportunities in her field that might provide better income and still be more fulfilling for her personally.
As for as minimizing her expenses, the Court finds it notable that Debtor voluntarily contributed to her retirement savings, funded her son's largely private primary and secondary education, purchased a home in the Broad Ripple area of Indianapolis, and has not sought any contribution from her now-adult son in paying their household expenses. While of less concern to the Court, Debtor has also chosen to take several trips and maintain certain discretionary spending,[6] notwithstanding the Loans. From these facts, the Court cannot conclude that Debtor has made a good faith effort to minimize her expenses.
Based on the foregoing, the Court concludes that the United States is entitled to summary judgment in its favor as to the third prong of Brunner . And given that Debtor has failed to establish, in the very least, a genuine issue of material fact for two of Brunner's three prongs, the Court must grant the Motion in favor of the United States.
Before concluding this decision, the Court must address Debtor's request-made in the event she was denied a full discharge-for a partial discharge of the Loans. The Court declines Debtor's request.
The Court is hesitant to conclude that § 523(a)(8) even permits partial discharge, see, e.g., Grigas v. Sallie Mae Servicing Corp. (In re Grigas) , 252 B.R. 866, 870-71 (Bankr. D. N.H. 2000) (plain text of § 523(a)(8) does not support partial discharge) (collecting cases). But that hesitation aside, the facts here do not warrant a partial discharge. While the Court rejected the United States' argument that an ICRP payment should be the measure under the first prong of Brunner , it nevertheless finds that the availability of such a repayment program for Debtor relevant for purposes of partial discharge. See Chance v. U.S. (In re Chance) , Adv. Pro. No. 17-50476, 2019 WL 2240903 at *13 (Bankr. S.D. Ind. Mar. 21, 2019). Absent a full discharge of the Loans, Debtor may still avail herself of an income contingent repayment plan that appears well within her means. If she participates under such a repayment program for the prescribed period, she will be entitled to a discharge from the DOE of the remaining balance-thereby effectuating what amounts to a partial discharge. Compare Fecek v. Sallie Mae, Inc. (In re Fecek) , Adv. Pro. No. 13-50089, 2014 WL 1329414 (Bankr. S.D. Ind. Mar. 31, 2014) (court granted a partial discharge where debtor was not eligible for an ICRP). While there may be tax consequences for Debtor upon discharge, a potential tax liability at the end of the repayment period is too speculative to constitute an undue hardship. See *51 Archibald v. United Student Aid Funds, Inc. (In re Archibald) , 280 B.R. 222, 229 (Bankr. S.D. Ind. 2002) ("The charge of the Court under § 523(a)(8) is to determine the issue of undue hardship as of today, not some date in the future.").[7]
Conclusion
Based on the foregoing, the Court hereby grants the United States Motion and holds that the Debtor's indebtedness under the Loans does not constitute an undue hardship for purposes of 11 U.S.C. § 523(a)(8). The Court will issue a judgment consistent with this decision contemporaneously herewith.
SO ORDERED:

Debtor's Schedules I lists gross pas as of the petition date of $ 2,460 and net income of $ 1,807.45.

The Unites States bases is calculation of Debtor's current disposable income on (1) the undisputed increase in Debtor's income since the filing of the Complaint; (2) the expenses she listed in Schedule J of her bankruptcy petition; and (3) the elimination of two of the expenses-her voluntary retirement contribution and her car payment-listed in Schedule J. Debtor, in turn, suggests-without reference to any designated evidence-that the expenses she listed in Schedule J are actually too low. She insists that she only has $ 367.00 in disposable income based on her current salary. In the end, this dispute is not material to the Court's decision.

The questions include: What is Debtor's current monthly surplus? Does Debtor's teaching license have value or not? Was the loan forgiveness Debtor received an actual forgiveness of debt or was it merely applies to interest? Did Debtor join the Army National Guard in order to receive $ 10,00 for each year of service? After she completed 2.5 years of service, did the loan forgiveness occur for those years? What is Debtor's primary reason for not currently participating in an income-driven repayment program? Has Debtor's son not applied for college because they cannot afford college? Would the application fees required by wasted? What amount could Debtor pay so that the debt is repaid but is not an undue hardship for her family? Did Debtor make a good faith effort to repay the student loan to the United States?

Admittedly, it is not clear whether Debtor could afford to make contractual student loan payments even with the higher salary she might earn were she to return to education administration. Debtor's argument as to Brunner's second prong rests exclusively on her decision to leave the field of education as the required "additional circumstances." From this, the Court assumes that Debtor herself believes that she could more easily make her student loan payments were she to return to education and declines the opportunity to make any assumption as to whether she could afford her contractual payment under the Loans were she to make a salary commensurate with her past jobs in education administration.

Debtor's deposition testimony suggests that she was on an IBRP for less than a year, that she was paying approximately $ 400.00, and that she stopped participating in the program when she lost her job at Providence.

The United States emphasized Debtor's cell phone, satellite television and personal care expenses. While the Court agrees that such expenses could likely be reduced or eliminated, it does not necessarily want to suggest that debtors seeking an undue hardship discharge of student loans are categorically prohibited from having a cell phone (or cable, internet service or the like) or are prohibited from spending money on things like personal care. But the Court is more likely to emphasize these expenses if they appear to exceed basic service or could be eliminated without causing too much distress. See, e.g., Educ. Credit Mgmt. Corp. v. Stanley , 300 B.R. 813, 818 (N.D.Fla.2003); Campton v. U.S. Dep't of Educ. (In re Campton), 405 B.R. 887, 891 (Bankr.N.D.Ohio 2009) ("While a minimal standard of living does not mandate that a debtor live in poverty to qualify for a discharge of their student-loan obligation, it does mean that the debtor is expected to do some financial belt-tightening and forego amenities to which he may have become accustomed.").

There may be other ways to deal with these tax consequences, too, e.g., by exclusion of the amount of forgiven student loans from gross income. See Hopson v. Ill. Student Assistance Comm'n (In re Hopson) , 588 B.R. 509, 515 (Bankr. N.D. Ill. 2018) (citing 26 U.S.C. § 108(a)(1)(A) and (B).